```
                    UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :     Crim. No. 4:CR-02-0034-002
                               :
        v.                     :     (Judge McClure)
                               :
PETER GEORGACARAKOS            :     ELECTRONICALLY FILED
```

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR COURT ORDER SEEKING DISCLOSURE OF ALL FBI 302 REPORTS NOT PREVIOUSLY DISCLOSED TO THE DEFENDANT

**Procedural History.**

Relevant procedural history for purposes of considering the issues raised herein begins on May 14, 2004. On that date, after the jury found defendant guilty of second degree murder in violation of 18 U.S.C. § 1111, this Court *inter alia* imposed a term of life imprisonment.

Defendant filed a timely Notice of Appeal. On June 21, 2005, the Court of Appeals affirmed the conviction but vacated the sentence, and remanded proceedings for further consideration in light of *United States v. Booker*, 543 U.S. ___, 125 S. Ct. 738 (2005).

Since the remand of this case, defendant has sought continuances of his re-sentencing, which presently is scheduled for March 8, 2006. On January 12, 2006, defendant filed the instant motion for disclosure of all FBI 302 reports not previously given to him. Simultaneously, defense counsel filed a

supporting brief.  Herewith presented is an opposition to that request.

**Statement of Facts.**

Defendant claims that six factors support his request for this Court to order disclosure of all FBI interviews in conjunction with its investigation into the murder of the Randall Anderson.  While many of these matters will be addressed in Argument, a further background on discovery is appropriate.

Defense counsel received by way of exculpatory information a listing of <u>all</u> inmates in "B" block on the night of the murder, November 7, 1996, as well as their then current whereabouts.  See Government Exhibit 1, Discovery Letter dated February 14, 2002.  Also enclosed with that letter were interviews with certain inmates thought to be exculpatory including Reid, Harrnage, Barren, Scutari, and Dodd, as well as an unsigned note relating to inmate Villa.  See Attachments to Government Exhibit 1.

Defendant notes that a number of inmates were placed in the Special Housing Unit on November 8, 1996, whom he believes may have relevant evidence.  Defendant Exhibit 2.  Of the eleven people named, defense counsel received, either in the discovery

letter of February 14, 2002, or in subsequent pleadings[1] filed on June 13, 2003, interviews of five of the eleven individuals.

The FBI has submitted three additional 302s or interviews for those individuals to illustrate to the Court *in camera* that none of them contained exculpatory information. For three other inmates, there is no record that they were interviewed by the FBI. Government Exhibit 2, Statement from Special Agent Ebersole. Indeed, the premise of defendant's request for information from those, in their view, potentially favorable witnesses is incorrect, since the FBI did not interview all inmates placed in the Special Housing Unit and Lewisburg Penitentiary officials had multiple reasons, unconnected to solving the crime, for placing individuals in the Special Housing Unit.

**Issue.**

Given the inapplicability of any rule of procedure which allows for discovery of information at this time, as well as the insubstantial basis provided by defense counsel, this Court

---

[1] Defense counsel asserted in pleadings filed on June 2, 2003, at ¶¶ 28-35, that former inmate Matthew Darby, who died prior to trial, had information favorable to the defense. But that inmate's various statements to authorities were disclosed by the prosecution in opposition to their Motion to Dismiss which, contrary to defendant's claim of exculpatory evidence, revealed that Darby either had seen nothing or had seen Kowaalski and Georgacarakos deliberately murder Anderson. Defense counsel refers to this revelation in pleadings but misspells the inmates name as "Barbie." (Brief of Defendant, p. 4.)

should not order the wholesale disclosure of FBI interviews of all inmates who may have been questioned about the Anderson killing.

**Argument.**

    **Introduction**

Defendant's request for disclosure for all FBI interviews is long on anecdotal information, irrelevant analogies, and "Oliver Stone"-like conspiracy suppositions, but very short on probative authority or explanations why materials attached to his pleadings reflect unfairness by the prosecution. Indeed, what claims are made from a legal perspective are incorrect which undercut, it is asserted, the overall *bona fides* of defendant's request in this matter. After first identifying the pertinent law, an analysis will be undertaken of the justification offered by defendant to receive the entirety of the FBI interviews. Upon doing so, it is submitted that this Court should conclude that defendant's request is based upon no authoritative precedent and such insubstantial conjecture that it should be denied.

    **Legal Standards**

Initially, defendant suggests that there is some urgency for this Court to review the matter at <u>this</u> time since the "three year time frame for filing such a motion under Rule 33 [Federal Rules of Criminal Procedure] will expire on February 4, 2007." (Defendant Motion, ¶ 2.) No explanation is given as to how

defendant arrives at this date.  Moreover, this calculation may have been close had Georgacarakos <u>not</u> pursued an appeal of his conviction and sentence.  An additional sentence of Rule 33, not noted by defendant, states: "If an appeal is pending, the Court may not grant a motion for a new trial until the appellate court remands the case."  *Id*.  For courts which have reviewed the timeliness of a motion for a new criminal trial, based upon supposedly newly discovered information, the general consensus is that the time frame does not begin to run until after the mandate issues from the court of appeals.  See *United States v. Reyes*, 49 F.3d 63, 65-68 (2nd Cir. 1995).  Under the reasoning of *United States v. Reyes, supra*, defendant need not file any new motion for new trial, based on newly discovered evidence, until three years after the Third Circuit issued the mandate in this case or approximately July 2008.  Consequently, time is hardly of the essence.

It is well established that this Court is not empowered under general discovery provisions, or even the Constitution, to require, as Georgacarakos requests, the prosecution to disclose the wholesale investigation prepared by any law enforcement agency <u>prior</u> to trial.  *United States v. Arroyo-Arulo*, 580 F.2d 1137, 1143-44 (2nd Cir.), *cert. denied*, 439 U.S. 913 (1978); *United States v. Azzarelli Constr. Co.*, 459 F. Supp. 146, 152-53 (E.D. Ill. 1978), *aff'd* 612 F.2d 292 (7th Cir.), *cert. denied*,

447 U.S. 920 (1980). And yet, defendant's modest demand is for "disclosure of all FBI 302 reports not previously disclosed to the defendant." Federal Rule of Criminal Procedure 16 would not appear to be applicable to defendant's request. Indeed, the terms of that discovery provision refer only to trials and do not refer at all to post-trial proceedings. *United States v. Nobles*, 422 U.S. 225, 235 (1975) (Powell, J.) (Rule 16 relates to pretrial discovery). Moreover, Rule 16(a)(2) specifically does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." There is a continuing duty of disclosure pursuant to Federal Rule of Criminal Procedure 16(c). But this provision contemplates that this occurs "before or during trial. . .," not at the re-sentencing[2] phase of any proceeding.

   To be sure, defendant cites *Brady v. Maryland*, 373 U.S. 83 (1963). (Brief of Defendant, p. 1.) However, as the Third Circuit repeatedly has noted, the rule of *Brady* is not a rule of discovery but one entailing fundamental fairness. *See United States v. Starusko*, 729 F.2d 256 (3rd Cir. 1984), *cited in, United States v. Pelullo*, 399 F.3d 197, 215 (2005). The Supreme Court reached this same conclusion. *United States v. Bagley*, 473

---

[2] Assuming *arguendo* this Honorable Court may have inherent power under the Federal Rules to require disclosure of evidence that may be pertinent to sentencing or even re-sentencing. However, defendant's broad request has no bearing on the issues remaining to be resolved by this Court on remand.

U.S. 667, 675 n. 7 (1985). Moreover, it is submitted that the government's obligation in this case has narrowed rather than expanded over time. For example, prior to trial, the government disclosed 302s or interviews of individuals which suggested that persons <u>other</u> than Georgacarakos and Kowaalski committed the murder of Randall Scott Anderson. See Government Exhibit 1. That trial having occurred and both Georgacarakos and Kowaalski having admitted that they stabbed the decedent but for different reasons, the only question is whether interviews or 302s exist which suggest and support Georgacarakos' trial strategy that he acted in self-defense or in the defense of Kowaalski on the evening of November 7, 1996. As the *in camera* sampling of non-released 302s indicates, no one stepped forward on November 8, 1996, or later and supported that theory in statements to law enforcement officials.

It is respectfully submitted that this Court cannot order the relief requested by defendant at this time. The closest, by way of analogy, method for compelling disclosure would be in conjunction with Georgacarakos' likely, but at this time anticipatory, challenge to his conviction, pursuant to 28 U.S.C. § 2255. While Rule 6(a) and (b) of the rules relating to those proceedings authorizes discovery, a petitioner must demonstrate first to a reviewing court both "good cause" as well as "reasons" for disclosure. Assuming *arguendo* that this Court may consider

the issue now, it is submitted that Georgacarakos has not met the threshold for obtaining such relief under this somewhat analogous provision.

**The Basis for Disclosure Now**

Defendant suggests that there are six separate bases which support an order from this Court requiring disgorgement of all 302 reports. (Defendant Motion, ¶¶ 3-26.) Two are in murder cases that are in distinctly different procedural postures while four relate to information developed regarding the Anderson killing by defense counsel since the jury's verdict in this case. Even if these discordant items were all combined, it is submitted they do not justify the relief sought and do not reflect any Due Process violations in this or even other cases.

Georgacarakos begins with Judge Muir's adverse ruling in *United States v. Hammer*, ___ F. Supp. 2d ___, (2005), WL 3536206 (M.D. Pa. December 27, 2005). It is true, relying upon *Brady*, that the District Court granted relief in the form of a new penalty phase in that case due to the failure to disclose FBI 302 reports to defense counsel. The unvarnished reliance by defendant on Hammer is that since the same prosecutor is involved in both cases, if he violated *Brady* in Hammer, he probably violated the same rule in this case. (Brief of Defendant, pp. 2-3.)

The United States is presently asking for Judge Muir to reconsider his ruling since Hammer obviously had first hand knowledge of this withheld information, his "kinky" sexual practices, which some inmates shared with FBI agents. Telling also is the fact that Judge Muir did not vacate the guilty plea entered by Hammer notwithstanding the non-release. *Id.*

In the instant case, Georgacarakos may not know which of the inmates on B-Block might have seen him on "B-1" on November 7, 1996, purportedly either defending himself or defending Kowaalski. However, he did receive full access and knowledge of everyone who was in a position there to observe his behavior on that date. Indeed, he secured the testimony of Richy Lawlor at his trial even though Lawlor, who was interviewed by the FBI, did not share those details about Georgacarakos' allegedly defensive actions with that agency. (TT, January 28, 2004, pp. 59-61.) Since defendant was well aware of the universe of potential witnesses who may have observed his behavior on "B-1" as well as knew with which inmates he had discussions about why he acted as he did on November 7, 1996, there is no need for disclosure of any additional 302 reports to him.

The other murder case upon which he relies is *United States v. Slocum, et al*, M.D. Pa. Crim. No. 4:CR-02-196 (McClure, J.). (Defendant Motion, ¶¶ 8-20.) In that case, which never reached an imminent trial phase before this Court, he points out that

boxes of materials were not known to the California prosecutor who took over the case from prosecutors in this District, until recently.  But neither this Court's trial order in *Slocum, supra*, nor the only pertinent provision, Federal Rule of Criminal Procedure 16(a)(1)(E), required that all physical evidence in existence and related to the incident be disclosed to the defense several months prior to any scheduled trial, which was the case in *Slocum, supra,* in this District.  Moreover, in that situation the issue is discovery of potential trial exhibits and, in the instant case, defendant seeks release of all FBI interviews on the unsupported belief that information contained therein would have helped his defense.  Given the exceedingly different procedural history in which that prosecution existed in this District as well as the lack of knowledge of a different United States Attorney's Office as to what materials were present in Pennsylvania, defendant's suggestions that this situation somehow suggests a pattern of unfairness or deliberately withholding relevant, helpful evidence to defense counsel in this case falls flat.

   With respect to the instant prosecution, defendant first points to an apparent memo from the Warden at the Lewisburg

Penitentiary[3] relating to the fact that eleven individuals were placed in the Special Housing Unit at the Lewisburg Penitentiary shortly after the Anderson stabbing. (Defendant Motion, ¶ 26a; Exhibit 2.) But defense counsel received the 302 reports from five of those persons who were contained on that list. This Court can review *in camera* the 302 reports of three additional persons to determine for itself whether they contained discoverable and exculpatory material. Finally, notwithstanding defendant's musings, there is no record that three of the persons placed in that area were ever interviewed by the FBI at all. Defense counsel posits the significance of this listing as follows:

> One has to assume that even if there was not any sort of investigation before these individuals were locked down, once they were locked down some sort of investigation was undertaken by the FBI, which resulted in these ten individuals apparently being cleared of involvement since none of them were indicted along with Georgacarakos and Kowaalski.

(Brief of Defendant, p. 4.)(Emphasis supplied.) But the FBI does not operate the Lewisburg Penitentiary. Moreover, prison officials have reasons well beyond the solution of crimes to place inmates in the Special Housing Unit following a murder.

---

[3] As Government Exhibit 2 indicates, this apparently legitimate document was not part of the investigatory materials which the SIS and FBI possessed. Instead, it appears to be a recapitulation of measures taken by Lewisburg officials sometime in late 1996 or 1997 after two murders occurred in November 1996.

11

(See Government Exhibit 2; 28 C.F.R. § 541.22(a).)  Simply put, the premise upon which Georgacarakos relies for disclosure as it relates to placement in restrictive housing is totally wrong.

Defense counsel also points to the fact that a Bureau of Prisons' document prepared at the Central Office level indicates that medical personnel saw clothes being thrown out of the "B-2" area on the night of Anderson's murder.  (Defendant Motion, ¶ 26a; Exhibit 3.)  Of course, this is at best, triple hearsay information.  Moreover, it is easily understandable that "Jeff," because the person made observations in the hospital area, inferred that the witness was "med staff."  But in truth and in fact, at trial, Correctional Officer Charles Berkoski testified that, while working on a suicide watch, he had observed from the second floor of the hospital Kowaalski and one other white inmate throwing clothing and knives out of the second floor window of B-block.  (TT, January 13, 2004, pp. 76-79.)  This apparently obvious but minor error by an analyst removed from the scene by over one hundred miles, if not other factors, does not suggest that the government withheld exculpatory information from the defense, especially considering, if true, it is duplicative of testimony offered at trial which was <u>incriminatory</u>.

Defendant next asserts his counsel should have received documentation from the Bureau of Prisons' ADX facility analyzing a letter from inmate Edgar Hevle who communicated with another

person.  (Defendant Motion, ¶ 26b; Exhibit 4.)  Specifically, it is noted in correspondence that "And [Mad and Pete] gave me some news.  Them and Woody [Kenaston].  Human nature sure is hard to figure out.  What makes a strong man break weak.  It's beyond me. . . ."  *Id*.  The question is begged by defendant's presentation: was Helve in B-block at Lewisburg on November 7, 1996?  Additionally, the import of his correspondence does not suggest that this inmate received any information from the co-defendants helpful to their defense -- only that at the ADX[4] he "met" with them and Kenaston, who was involved in a later assault on a black inmate.  Defendant simply provides no explanation as to why these two attacks, which are mentioned in the text accompanying Hevle's letter, somehow makes Kenaston the source of some <u>exculpatory</u> information which was withheld from the defense in this case.  It is submitted that Due Process does not require the disclosure of all intercepted or reviewed correspondence in which an inmate indicates that he encountered a suspected murderer in prison.

At the risk of repetition, Kenaston's name was released to the defense as a former B-block inmate on February 14, 2004.  Moreover, defendant was well aware of him as a potential witness since his 28-page double-sided letter to Kowaalski at the ADX

---

[4] Defense counsel obviously had access to and interviewed inmates at the ADX such as Kenaston.  Indeed, inmates Scutari Greschner, and Usher testified about their various communications with Kowaalski at that prison.  (See TT, January 23, 2004 and January 26, 2006.)

13

expressed concern that "Woody" and others may cooperate with the prosecution.  (TT, January 21, 2004, pp. 78-79.)

Finally, defendant notes that Kowaalski was involved on February 11, 1998, in a fight with a black inmate who was being transported to the ADX in Florence.  (Defendant Motion, ¶ 26c; Exhibit 5.)  It is asserted "this information seems to be inconsistent with Kowaalski's testimony at trial when he claimed that the had seen the error of his ways and was no longer prejudice [sic], and also claimed not to be a racist."  (Defendant Motion, ¶ 26c.)  Of course, this claim has nothing to do directly with the release of *Brady* interviews but instead implies a different Due Process violation by the prosecution in withholding impeachment materials pursuant to *Giglio v. United States*, 405 U.S. 150 (1972).  But the devil also is in the details.  When is it exactly that Kowaalski indicated that he had seen the error of his ways?  Was it before February 11, 1998, or at some later point in time and, in fact, after he received in March 2001 the infamous 28-page, double-sided, "kite" from Georgacarakos which contained a multitude of racial slurs.  (TT, January 21, 2004, pp. 69-88.)  If defendant or his attorney can demonstrate that Kowaalski's so called "conversion" occurred before February 11, 1998, by specific reference to the trial transcript, they may have a point.  The prosecution will await their efforts to do so especially since it is not believed that

14

this witness' "change of heart" occurred until sometime well into this millennium.  Consequently, withholding reference to the February 11, 1998 incident was wholly immaterial, innocuous, and not suggestive of any pattern of Fifth Amendment violations.

**Conclusion.**

"Counsel for Georgacarakos believes a reasonable good faith basis has been established for this Court to order the government to immediately turn over to counsel for Georgacarakos copies of all previously undisclosed 302s drawn up in conjunction with the investigation of the stabbing death of Randall Scott Anderson, . . . ."  (Brief of Defendant, pp. 4-5.)  In doing so, they have proffered in Defendant Exhibit 1 the names of six inmates whose 302 reports, among others, they seek but only three of whom were in fact interviewed by the FBI.  This Court may examine *in camera* those particular encounters and, if thought to contain exculpatory details, immediately release them to support any claim for a new trial based upon *Brady* violations.  This was the practice utilized in an earlier *Brady* claim by defendant and which was resolved by this Court's orders of November 7 and 14, 2003.  It is submitted that a fair reading of those documents demonstrates that there is nothing in their contents which would aid defendant.  Given that their selected interviews do not reflect a Due Process violation, there hardly is a need to release all 302 reports of inmates.

15

It is submitted that the information provided by defendant to this Court in pleadings hardly meets any standard which supports disclosure. Incorrect suppositions from other murder trials, bits and pieces of inaccurate, triple hearsay, or other irrelevancies which may be related to the Anderson killing fail to establish any basis upon which this Court should act to disclose all inmate interviews. Under the circumstances, it is submitted that this Court has no legal authority or even significant justification to order the relief which Georgacarakos seeks.

                                            Respectfully submitted,

                                            THOMAS A. MARINO
                                            United States Attorney

                                            By s/Frederick E. Martin
                                            FREDERICK E. MARTIN
                                            Assistant United States Attorney
                                            PA 57455
                                            Herman T. Schneebeli Federal Bldg.
                                            240 West Fourth Street, Suite 316
                                            Williamsport, PA 17701-6465
                                            Tele:  (570) 326-1935
                                            FAX:  (570) 326-7916
                                            Electronic Mail:
                                            Fred.Martin@usdoj.gov

Dated:  January 31, 2006

```
                IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA     :    Crim. No. 4:CR-02-00034-002
                             :
         v.                  :    (Judge McClure)
                             :
PETER GEORGACARAKOS          :    ELECTRONICALLY FILED
```

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR COURT ORDER SEEKING DISCLOSURE OF ALL
FBI 302 REPORTS NOT PREVIOUSLY DISCLOSED TO THE DEFENDANT**

and to be electronically mailed on January 31, 2006, to:

ADDRESSEE:
        Ronald C. Travis, Esquire
        rtravis@riederstravis.com


                                              s/Frederick E. Martin
                                              Frederick E. Martin
                                              Assistant United States Attorney